IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SARA A. CARPIO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-718-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, Sara A. Carpio ("Carpio"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Carpio appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Carpio was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

**Claimant's Background**

Carpio was 20 years old at the time of the hearing before the ALJ on July 7, 2010. (R. 31-32). She was 5'11" tall, and she weighed about 350 pounds. (R. 32). Carpio testified that she had left school after tenth grade because her father was abusing her. (R. 33).

She had surgery on a knee on June 1, 2010, and was on crutches at the time of the hearing. (R. 32). She had injured her knee at work in January 2008. (R. 38). After the injury, she used crutches for a couple of months and then quit using them. (R. 40-11). She testified that her knee would "give out" and she would fall. (R. 41). After one of these incidents, she would not be able to walk for a few days. *Id.*

Carpio testified that she had spent the previous two years mostly in bed as a result of her problems walking. (R. 42-43). She did not help with dishes, but she would help some with folding laundry. (R. 43). For her daily routine, she would wake up around 11 o'clock in the morning. (R. 43-44). She would fall asleep around 4 or 5 o'clock in the morning. (R. 44). She testified that she would be awake with pain in her back and her knees. *Id.* She only got out of bed to go to the bathroom. *Id.* Her mother or her grandmother would bring her meals in bed. *Id.* She watched television and read for pleasure. (R. 47-48). She had no social activities. (R. 49). She had a driver's license, but could not drive due to the condition of her knees. *Id.*

At the time of the hearing, she was trying to get around more on her crutches. (R. 44-45). Her surgeon had told her that her other knee would need surgery, because she was using it to put most of her weight on. (R. 45). Her doctors had told her that her weight was part of the problem and that she needed to lose weight. *Id.* She was trying to lose weight and was seeing a dietician. *Id.* She testified that before the injury to her knee happened, she was running five miles a day and she had lost weight down to 240 pounds. (R. 45-46).

Carpio testified that she suffered from depression. (R. 46). She had been prescribed an antidepressant, and she was going to try to see a therapist. (R. 47). The depression was part of why she wanted to stay in bed and avoid people. *Id.*

Carpio was seen at Oklahoma State University Medical Clinic (the "OSU Clinic") on November 16, 2006. (R. 245-46). Impressions included depression, and Wellbutrin was one of the medications refilled. (R. 246).

On January 22, 2007 at the OSU Clinic, Carpio complained of chest pain, shortness of breath, and nausea. (R. 241-42). In the section for impressions, the physician noted the need to determine if the chest pain was psychosomatic or caused by anxiety and whether Carpio's headaches were migraine or tension headaches. (R. 242). Other impressions were depression and anxiety and a history of physical abuse. *Id.* On a return visit on February 5, 2007, the physician noted a need to determine if chest pain was caused by anxiety or hypothyroidism. (R. 239-40). The other impressions were the same as for the January visit. (R. 240).

Carpio returned to the OSU Clinic on March 7, 2007, and impressions were hypothyroidism, insomnia, and obesity. (R. 237-38). On May 25, 2007, impressions included right knee pain, with a note that it was possibly patellar-femoral disorder. (R. 233-34). On June 13, 2007, impressions included hypothyroidism, depression, headache, and hyperlipidemia. (R. 231-32). The physician noted that he explained at length a low fat / low calorie diet, and Carpio replied that she was unable to follow that diet. (R. 232). Medications included amitriptyline and Wellbutrin. *Id.* Carpio returned to the OSU Clinic for refills on October 3, 2007 and requested "something better for insomnia." (R. 229-30). Impressions included hypertension, obesity, depression/anxiety, and insomnia. (R. 230). Amitriptyline was discontinued, and trazodone was added. *Id.*

3

Carpio presented to the emergency room at Hillcrest Medical Center ("Hillcrest") on January 16, 2008 because she slipped on a wet floor at work and fell, resulting in left knee pain. (R. 361-74). X-rays of the knee were negative. (R. 369).

Carpio was seen by Bradford L. Boone, M.D. of Eastern Oklahoma Orthopedic Center on February 25, 2008. (R. 350). Dr. Boone's opinion was that Carpio had a "[r]esolving grade III medical collateral ligament sprain." *Id.* He said that she could return to "light work, mostly sedentary work." *Id.* His opinion was that she required physical therapy and time to recover. *Id.*

Carpio was seen at the OSU Clinic on February 29, 2008, and she reported that she had fallen at work and that the emergency room physician recommended an MRI. (R. 225-26). The impression was knee sprain. (R. 226). On March 19, 2008, it was noted that Carpio's left knee pain continued and that the knee was locking, catching, and popping. (R. 223-24). The impression was left knee pain with some instability. (R. 224).

An MRI of Carpio's left knee was completed on March 20, 2008. (R. 252). The reviewing physician noted that the study was suboptimal due to movement, but no definite tear, injury, or significant joint effusion was seen. *Id.*

On June 16, 2008, Dr. Boone believed that Carpio's sprain had healed, and she was released from care with no restrictions. (R. 349).

Carpio returned to the OSU Clinic on July 16, 2008, and her BMI was noted as 57. (R. 221-22). One of the impressions was morbid obesity. (R. 222). On September 17, 2008, impressions included chronic pain secondary to back surgery and morbid obesity. (R. 219-20). Similar impressions were given on December 9, 2008. (R. 207-08).

The administrative transcript contains a report dated March 3, 2009 by Richard A. Hastings II, D.O. Ph.D. that was completed in connection with Carpio's workers' compensation case. (R. 272-76). Dr. Hastings' opinion was that Carpio was temporarily totally disabled and that she needed further diagnostic evaluation. (R. 275-76). An MRI study of Carpio's left knee was completed on March 5, 2009. (R. 277-28).

Carpio presented to the emergency room at Hillcrest on September 29, 2009 when she fell because "both knees gave out." (R. 353-60).

Kevin Dukes, M.D., with Tulsa Bone and Joint, evaluated Carpio on October 7, 2009 as part of her workers compensation case. (R. 314-15). Dr. Dukes stated that he wanted to review her past medical records which were not available to him, but his opinion based in part on the March 5, 2009 MRI was that Carpio's problems were largely based on a "congenital patellofemoral maltracking" issue combined with her obesity. *Id.*

Carpio saw Loretta A. Farrell, M.D. on November 2, 2009 to get re-established for care. (R. 442-45). Prescriptions included Wellbutrin and Trazodone. (R. 445). At a follow-up appointment on November 30, 2009, Carpio asked for a referral to a psychologist to deal with her depression. (R. 437-39).

Carpio saw Dr. Dukes in November and December 2009. (R. 324-25). She was evaluated by Dr. Hastings on December 29, 2009. (R. 410-14). His opinion was that Carpio continued to be temporarily totally disabled. (R. 411, 413). He recommended that Carpio continue under the care of Dr. Dukes. (R. 414). Carpio saw Dr. Dukes in January and March 2010. (R. 321-23).

Records indicate that Carpio was given a nutrition consultation assessment on April 19, 2010. (R. 419).

Carpio saw Dr. Farrell on January 20, 2010, March 4, 2010, and May 17, 2010. (R. 420-23, 427-36).

Dr. Dukes performed arthroscopic surgery on Carpio's left knee on June 1, 2010. (R. 318-19). His preoperative diagnoses were patellar chondromalacia and patellar maltracking, and his postoperative diagnoses were chondromalacia of the patella and lateral trochlea, and patellar maltracking, and chondromalacia of the lateral tibial plateau. (R. 318).

Dr. Farrell completed a form titled "Medical Source Statement of Ability to do Work-Related Activities (Physical)" dated June 30, 2010. (R. 481-82). On this form, Dr. Farrell indicated that Carpio could occasionally or frequently lift up to 20 pounds. (R. 481). She said that Carpio could walk or stand for 30 minutes to one hour at one time, and for a total of less than 2 hours in an 8-hour day. *Id.* Carpio could sit for one-to-two hours at one time, and for a total of 6 or more hours in an 8-hour day. *Id.* Dr. Farrell appears to state that Carpio was under the orders of Dr. Dukes to use a cane to walk, but this hand-written note is not totally clear. (R. 482). She said that Carpio could not walk one block at a reasonable pace due to pain and unstable knees. *Id.* She said that Carpio would be able to sustain an 8-hour day and 5 days a week. *Id.* She said that Carpio's depression would be an additional limitation that would affect her ability to work. *Id.* She said that Carpio would be absent from work three or more times a month due to her medical issues and treatment for her knee pain, back pain, and migraine headaches. *Id.*

Agency consultant Joel Justin Hopper, D.O. examined Carpio on May 26, 2009, and her chief complaints were knee and back pain. (R. 279-284). On examination, Carpio's left knee had "reduced painful" range of motion. (R. 280). Dr. Hopper said that Carpio could move about the examination room easily, but she had reduced and painful range of motion of the spine. *Id.*

6

His assessments included morbid obesity, chronic lumbar pain - status post L5 fusion secondary to trauma, and chronic left knee pain "likely due to internal derangement of the left knee including ligamentous or meniscus injury." *Id.* The accompanying backsheet reflected the limited range of motion of Carpio's lumbosacral spine and the pain those movements caused. (R. 281). While the text of his report said that toe and heel walking was normal, this sheet indicates that it was weak on the left side. *Id.* The range of joint motion evaluation chart showed reduced range of motion for Carpio's back and knees. (R. 282).

Nonexamining agency consultant Robert E. Hughes, M.D. completed a Physical Residual Functional Capacity Assessment dated July 29, 2009. (R. 288-95). For exertional limitations, Dr. Hughes said that Carpio could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand or walk at least 2 hours in an 8-hour day, and could sit for about 6 hours in an 8-hour day. (R. 289). He said that Carpio was limited in her upper extremities. *Id.* In the portion of the form for narrative explanation, Dr. Hughes reviewed Carpio's claims of disability and her reported activities of daily living. (R. 289). He briefly discussed Carpio's treatment from the OSU Clinic, the two MRI reports regarding her left knee, and Dr. Hastings' report of March 2008. (R. 290). Dr. Hughes briefly summarized the findings of Dr. Hopper, and he said that Carpio's obesity might be a contributing factor to her limitations. He concluded that the severity of Carpio's allegations were not "fully supported by the objective medical evidence in file." *Id.*

For postural limitations, Dr. Hughes found that Carpio could occasionally climb stairs, but could never climb ladders. *Id.* She could frequently balance, stoop, kneel, crouch and crawl. *Id.* He found that no manipulative, visual, or communicative limitations were established. (R. 291-92). For environmental limitations, Dr. Hughes found that Carpio should avoid concentrated exposure to vibration or to hazards. (R. 292).

7

Agency consultant Dr. John T. Atwood, clinical psychologist, conducted a mental status examination of Carpio on July 22, 2009. (R. 285-87). His Axis I[1] diagnoses were Post-traumatic Stress Disorder ("PTSD"), Attention Deficit / Hyperactivity Disorder ("ADHD"), pain disorder associated with psychological factors and a general medical condition, and recurrent major depressive disorder. (R. 286).

Agency nonexamining consultant Deborah Hartley, Ph.D. completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on August 20, 2009. (R. 296-313). For Listing 12.02, Dr. Hartley noted Carpio's ADHD. (R. 297). For Listing 12.04, Dr. Hartley noted Carpio's mood disturbance with depressive syndrome and depression. (R. 299). For Listing 12.06, Dr. Hartley noted Carpio's anxiety and recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. (R. 301). For Listing 12.07, Dr. Hartley noted Carpio's pain disorder secondary to psychological and general medical condition. (R. 302). For the "Paragraph B Criteria,"[2] Dr. Hartley found that Carpio had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 306). In the "Consultant's Notes" portion of the form,

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[2] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

Dr. Hartley noted Carpio's treating history for ADHD and depression. (R. 308). Dr. Hartley briefly summarized the report of Dr. Atwood. *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Hartley found that Carpio was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 310). Dr. Hartley also found Carpio to be markedly limited in her ability to interact appropriately with the general public. (R. 311). She found no other significant limitations. (R. 310-11). Dr. Hartley said that Carpio could perform simple tasks, she could relate to others in a superficial manner, she could not relate to the general public, and she could adapt to a work situation. (R. 312).

After the hearing, the ALJ requested an additional psychological consultative report. On October 12, 2010, agency consultant John W. Hickman, Ph.D. completed a mental status examination and a Medical Source Statement form. (R. 483-93). On testing, Carpio scored in the average range for general memory and working memory. (R. 486). On testing for attention span and recall, most of her scores were in the average range, with some in the low average range. *Id.* For word recall, her performance was borderline. (R. 487). Her verbal abstract thinking skills were average, as were her verbal reasoning and judgment. *Id.* Another test showed that her responses were consistent with ADHD. On a personality test, Carpio "endorsed a severe number of strange and unusual responses which can be interpreted as reflective of a high degree of stress and/or psychopathology or as a magnification of her difficulties." *Id.*

Dr. Hickman's diagnoses on Axis I were chronic pain syndrome associated with both psychological factors and a general medical condition; depressive disorder; ADHD; PTSD; and remote history of alcohol and substance abuse. (R. 488). On Axis II his diagnosis was features of histrionic, dependent, and passive aggressive personality disorders. *Id.* He scored Carpio's

Global Assessment of Functioning ("GAF")[3] as 60, indicating moderate emotional and personality difficulties. *Id.* Dr. Hickman gave the opinion that Carpio did not meet any disability criteria at the present time, but he did not know if she met a listing for her combined mental and physical difficulties. *Id.*

On the Medical Source Statement, Dr. Hickman indicated that Carpio had a moderate limitation in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances. (R. 490). He also found a moderate limitation in her ability to complete a normal workday and work week without interruptions for psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* He found a moderate limitation in Carpio's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 491).

## Procedural History

Carpio filed applications in April 2009 for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 123-35). Carpio alleged onset of disability as of January 1, 2008. (R. 129). The applications were denied initially and on reconsideration. (R. 67-75, 83-88). A hearing before ALJ John W. Belcher was held on July 7, 2010. (R. 28-62). By decision dated January 28, 2011,

---

[3] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

the ALJ found that Carpio was not disabled. (R. 11-21). On September 22, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents a final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Carpio met insured status requirements through March 31, 2010. (R. 13). At Step One, the ALJ found that Carpio had not engaged in substantial gainful activity since her alleged onset date of November 1, 2008.[5] *Id.* At Step Two, the ALJ found that Carpio had severe impairments of degenerative disc disease of the lumbar spine, arthritis in the left knee, asthma, obesity, ADHD, depression, anxiety, and somatoform disorders. *Id.* At Step Three, the ALJ found that Carpio's impairments did not meet any Listing. (R. 15).

---

[5] Carpio's application states onset on January 1, 2008, and the Court is unaware of any amendment to this date. (R. 129). If the ALJ is in error on this point, that error does not affect the undersigned's decision in this Opinion and Order.

The ALJ determined that Carpio had the following RFC:

> [Carpio] can stand/walk for two hours out of an eight hour day, 30 minutes at one time, and sit for six hours out of an eight hour day, one to two hours at one time. In addition, she can lift/carry 20 pounds occasionally and frequently and push/pull consistent with lift/carry. Further, she cannot climb ladders, ropes and scaffolding and should avoid dangers such as unprotected heights and fast machinery; she can occasionally climb stairs and ramps, balance, bend, stoop, kneel, crouch, and crawl. Mentally, she can do simple work with superficial contact with co-workers and supervisors and no contact with the public.

(R. 17). At Step Four, the ALJ found that Carpio could not perform any past relevant work. (R. 20). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Carpio could perform, considering her age, education, work experience, and RFC. *Id.* Thus, the ALJ found that Carpio was not disabled from November 1, 2008 through the date of the decision. (R. 21).

## Review

Carpio makes several arguments in her brief, among which is that the ALJ failed to properly consider the opinion evidence of Dr. Farrell. The Court finds that the ALJ did not sufficiently explain why he did not incorporate in his RFC determination all of the limitations found by Dr. Farrell. The Court therefore reverses and remands to allow the ALJ to make this explanation. Because reversal is required on this issue, the other issues raised by Carpio are not considered.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). The regulations of the Social Security Administration require that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 416.927(d); *see also* SSR 96-5p, 1996

WL 374183 ("[O]pinions from any medical source about issues reserved to the Commissioner must never be ignored."). An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection. *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished), *citing Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003). If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted. *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished), *citing* SSR 96-8p, 1996 WL 374184; *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner).

The Court agrees with Carpio that the ALJ erred by failing to include in his RFC determination limitations found by Dr. Farrell, who was a treating physician. *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007). The claimant in *Haga* had numerous physical and mental impairments, and the ALJ had included nonexertional restrictions in his RFC determination, limiting the claimant to "simple repetitive tasks" with "only incidental contact with the public," and "no requirement for making change." *Id.* at 1207. A consultant had completed an RFC form indicating that the claimant was moderately impaired in seven functional categories. *Id.* The claimant argued that the ALJ had implicitly rejected the consultant's opinion by failing to include any accommodations in his RFC determination that addressed the consultant's assessment that the claimant had moderate difficulty in her ability to deal appropriately with supervisors and coworkers and to respond appropriately to workplace pressures and changes. The ALJ had given no explanation relating to why he did not address some of the consultant's findings of moderate restrictions while including others, and the Tenth Circuit agreed that this omission required

reversal so that the ALJ could explain the evidentiary support for his RFC determination. *Id.* at 1207-08.

Here, Dr. Farrell gave two opinions in the form she completed that arguably were inconsistent with the RFC determination of the ALJ. First, she said that Carpio could walk or stand for a total of less than 2 hours in an 8-hour day. (R. 481). Second, Dr. Farrell said that Carpio would be absent from work three or more times in a month due to her medical issues and treatment for her knee pain, back pain, and migraine headaches. (R. 482). The ALJ asked the vocational expert (the "VE") what the effect would be of three absences a month, and the VE testified that Carpio would eventually lose any job she was able to obtain due to absenteeism. (R. 58-59).

In his decision, the ALJ gave a short description of Dr. Farrell's treatment of Carpio. (R. 20). He then said that he gave Dr. Farrell's medical source statement "considerable weight." The ALJ then said that his RFC determination was "supported by records and reports from" several doctors, including Dr. Farrell. He gave no explanation for why he implicitly rejected Dr. Farrell's opinion regarding how long each day Carpio could stand or walk and her opinion regarding how many absences Carpio would have each month. As explained by *Haga*, the ALJ is not entitled to accept some portions of an opinion and reject others with no explanation. This case must be remanded so that the ALJ can give an adequate explanation regarding those functional limitations for which his RFC determination differs from the medical opinion evidence.

The Commissioner suggests that the ALJ gave an adequate explanation by stating that he gave Dr. Farrell's opinion evidence "considerable weight," after stating that he gave the opinions of Dr. Boone and Dr. Dukes "great weight." Commissioner's Response Brief, Dkt. #20, p. 5.

15

The Commissioner states that "the comparative greater weight the ALJ gave to other medical opinions in the record, explains any discrepancies between the opinions and the ALJ's [RFC determination.]" *Id.* The only authority cited by the Commissioner for this concept appears to this Court to be inapposite. *See Tom v. Barnhart*, 147 Fed. Appx. 791, 793 (10th Cir. 2005) (unpublished opinion). In *Tom*, the ALJ had given specific reasons for discounting the opinion of the treating physician, including that she had not provided much treatment for the claimant's pain and that the opinion was inconsistent with other medical evidence. *Id.* If the ALJ had given reasons comparable to those the ALJ gave in *Tom*, those specific reasons might have supported the ALJ's implied rejection of the opinions of Dr. Farrell as discussed above. Here, the ALJ gave no reasons for failing to incorporate all of the opinions of Dr. Farrell, and his statement that he gave her opinions "considerable weight" rather than "great weight" does not constitute an adequate explanation.

Because the errors of the ALJ related to the opinion evidence require reversal, the undersigned does not address the remaining contentions of Carpio. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Carpio.

This Court takes no position on the merits of Carpio's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 14th day of February 2013.

Paul J. Cleary
United States Magistrate Judge